AUSA JUSTIN B. BIDWELL (313) 226-9610
Special Agent EDWARD MOORE, DEA (313) 234-4269

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
### Eastern District of Michigan

_41_

United States of America

v.

HUSSEIN AWADA

Case:2:12-mj-30758
Judge: Unassigned,
Filed: 12-11-2012 At 02:59 PM
USA v. Sealed Matter (CMP)(MLW)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  August 26, 2011 until December 11, 2012  in the county of  Macomb  in the
 Eastern  District of  Michigan , the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. 846 | Unlawful Distribution of a Controlled Substance |
| 21 U.S.C. 1349 | Conspiracy to Commit Health Care Fraud |

This criminal complaint is based on these facts:
PLEASE SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_Complainant's signature_

Edward Moore, Special Agent, DEA
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  December 11, 2012

_Judge's signature_

City and state:  DETROIT, MICHIGAN

HON. R. STEVEN WHALEN, U.S. MAGISTRATE JUDGE
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1.     The undersigned, Edward Moore, hereinafter referred to as the Affiant, being first duly sworn, hereby deposes and states as follows:

2.     I submit this affidavit in support of a two count complaint charging Hussein "Sam" AWADA, M.D. (AWADA) with Conspiracy to Unlawfully Distribute a Controlled Substance (more specifically, Oxycodone Hydrochloride and/or Oxymorphone) in violation of Title 21, United States Code, Section 846 and Conspiracy to Commit Health Care Fraud in violation of Title 18 United States Code, Section 1349.

3.     I am a Special Agent of the Drug Enforcement Administration (DEA) assigned to the Detroit Field Division, which is located in the Eastern District of Michigan. As such, I am an investigative or law enforcement officer of the United States and am authorized to conduct investigations and make arrests for violations of Title 21 of the United States Code. I have been a Special Agent with DEA since February of 2004. I have received specialized training on the subject of narcotics trafficking and money laundering at the DEA Academy located in Quantico, Virginia. I have been personally involved in numerous investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions and launder drug proceeds.

4.     I am aware of the following information from numerous sources including, but not limited to, my own personal observations and participation in this investigation and my review and analysis of written reports. This affidavit does not contain every fact of the investigation but rather just those necessary to establish probable cause.

5.     In 2011, DEA Detroit initiated an investigation into an illegal pharmaceutical drug trafficking operation based out of southeast Michigan. Your Affiant learned through Confidential Sources (CS) and other Sources of Information (SOI) that a patient recruiter/marketer (M-1) was a large distributor of illegal schedule II, III, IV, and V pharmaceutical controlled substances. The investigation also determined that M-1 had a criminal relationship with AWADA, who had been

1

prescribing large amounts of schedule II, III, IV, and V controlled substances outside the normal course of legitimate medical practice to patients brought into AWADA's medical office by M-1.

6.      On August 26, 2011, Investigators conducted a traffic stop on a vehicle owned and operated by M-1. During the traffic stop, Investigators recovered five Michigan Identification cards, and four empty prescription bottles for Oxycodone that were prescribed by AWADA. None of the identification cards or prescription bottles recovered were in M-1's name. Investigators also located $30,146.00 in U.S. Currency hidden in a bag of cat litter in the rear of the vehicle. Based on your Affiant's training and experience, large amounts of U.S. currency carried and hidden so as not to be detected by law enforcement is a common practice among narcotics traffickers.

## I.      MIDWEST FAMILY PRACTICE, PLC

7.      A review of the corporate filings for MIDWEST, obtained from the State of Michigan Department of Labor and Economic Growth (DLEG), revealed that MIDWEST was organized on or about February 27, 2003. MIDWEST's 2012 annual DLEG statement identified AWADA as a member and listed 12640 East 12 Mile Road, Warren, Michigan 48093 as the registered office. As recently as 2010, MIDWEST's DLEG filing listed AWADA as MIDWEST's President. Information obtained by the investigating agents from TS and CSA indicates that MIDWEST and AWADA have an assigned National Provider Index (NPI) number of 1811984594. MIDWEST is a medical center that specializes in Family Medicine.

8.      AWADA is registered with the DEA as a practitioner in Schedules II, III, IV, and V, and is assigned DEA# BA7720128. AWADA has been a registrant with the DEA since April 12, 2002. According to the State of Michigan Department of Community Health, AWADA has been licensed as a medical doctor since March 20, 2002, with permanent ID number 4301079394.

2

**II.    OXYCODONE HYDROCHLORIDE AND OXYMORPHONE**

9.      Oxycodone Hydrochloride and Oxymorphone are prescription painkillers used for moderate to high pain relief associated with injuries, bursitis, dislocations, fractures, arthritis, lower back pain, and pain associated with cancer.  Common brand names of Oxycodone Hydrochloride include OxyContin, Roxicodone.  A common brand name for Oxymorphone is Opana.  Oxycodone and Oxymorphone products are in Schedule II of the federal Controlled Substances Act of 1970.  OxyContin is a commonly abused pharmaceutical substance.    Street names for OxyContin include "OC", "Oxy", "Oxycotton", "Kicker", and "Hillbilly Heroin."

10.     OxyContin is available in 10mg, 15mg, 20mg, 30mg, 40mg, 60mg and 80mg tablets. Each tablet is a different color and one side is stamped with the letters "OC" and the other side is marked with the dosage.  The 80mg tablets are light green in color. Roxicodone is available in 5mg, 15mg, and 30mg tablets. The Roxicodone 30mg tablet is blue.  Opana is available in 5mg, 10mg, 20mg, and 40mg tablets.  Each tablet is octagonal and is a different color.  The Opana 40mg tablet is yellow.

11.     Oxycodone is typically taken orally.   A 10mg dose of orally-administered Oxycodone is equivalent to a 10mg dose of subcutaneously administered morphine. Pharmacological effects include euphoria and feelings of relaxation.  Because OxyContin is a controlled-release product, its effects can last eight to twelve hours.  As with most opiates, Oxycodone and Oxymorphone abuse may lead to dependence and tolerance.

12.     Pharmaceuticals such as Oxycodone can be diverted in many ways.  The most popular form is known as "doctor shopping," where an individual, who may or may not have a legitimate illness requiring a doctor's prescription for controlled substances, visits multiple doctors to acquire large amounts of controlled substances.   Other diversion methods include forging prescriptions, pharmacy diversion, and improper prescribing practices by physicians.

3

13.     Title 21 of the United States Code (U.S.C.) requires that every person who manufactures or distributes a controlled substance must be registered with the Drug Enforcement Administration and their activity with controlled substances is limited to the extent of their registration.   Title 21 U.S.C. § 802(21) defines a "practitioner" as a physician, dentist, veterinarian, scientific investigator, pharmacy, hospital or other person, licensed, registered or otherwise permitted by the United States or the jurisdiction in which he practices or does research, to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research.

14.     Title 21 U.S.C. § 822(a)(2) requires that every person who proposes to dispense, any controlled substance, shall obtain from the Attorney General a registration issued in accordance with the rules and regulations promulgated by him.   Title 21 U.S.C. § 802(10) defines the term "dispense" to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling, or compounding necessary to prepare the substance for such delivery.   Title 21 U.S.C. § 802(27) defines "ultimate user" as a person who has lawfully obtained, and who possesses, a controlled substance for his own use or for the use of a member of his household.

15.     A combination of federal statutes and regulations control the lawful dispensing or distribution of Schedule II through V controlled substances.   It is unlawful for a physician to distribute any Schedule II through V controlled substance if the doctor or pharmacist is "not acting within the usual course of professional practice" in violation of 21 U.S.C. § 841.

16.     The DEA has determined certain prescription medications are "controlled" based on their potential for addiction and abuse.   The DEA assigns "Schedules" to these prescription medications according to their potential for abuse and addiction, with a

4

controlled substance in Schedule II having the highest potential for addiction and abuse. Prescription drugs which are "controlled" are assigned to Schedule II, III, IV, or V.

### III.   WITNESS INTERVIEWS

#### A.   Clinton Township CS-1

17.   During the debriefing of a Clinton Township Police Department Confidential Source (CS-1) in September of 2011, CS-1 stated that s/he personally knows M-1 and AWADA.   According to CS-1, M-1 is involved in a large-scale prescription and insurance fraud scheme and AWADA is engaged in questionable medical practices.   CS-1 stated that from March 2011 through August 2011, s/he observed M-1 transport large groups of people several days a week to see AWADA.   CS-1 further stated that s/he observed M-1 go into each room with the patients as AWADA examines them.   The examinations only take a few minutes and the patients are all given the same prescriptions of Schedule II, III, and IV narcotics.

18.   CS-1 stated that one day s/he was told by AWADA to call M-1 and tell M-1 that, "we need more patients, more money for the new building!"   CS-1 further stated that patients who were not associated with M-1 would sign in, but had to wait in the lobby until they were called in, unlike M-1's patients who got in right away to see AWADA. CS-1 stated that if patients complained about pain anywhere on their body, AWADA would order a full body X-ray.   CS-1 stated that AWADA instructed him/her to give "nerve block" shots to every other patient, the shot consisted of "Depo-Torodol."   CS-1 was previously in a workplace setting with AWADA and therefore was privy to the above information.   The information by CS-1 concerning M-1 and AWADA is also corroborated through other sources of information such as trash collections, surveillance, and other witness statements contained in this affidavit.

#### B.   SOI-1

19.   During a debriefing of a source of information (SOI-1) in September of 2011, s/he stated that s/he knows M-1 and that M-1 brings patients to AWADA.   M-1 recruits patients to see AWADA in an attempt to receive medically unnecessary controlled

narcotics. M-1 then pays his/her patients for their controlled narcotics prescriptions and fills them at various pharmacies. After obtaining the narcotics, M-1 then distributes the narcotics. SOI-1 stated that from May 2011 through August 2011, s/he observed M-1 at AWADA's office in the morning several days a week and the patients that M-1 brought to see Dr. AWADA received priority.

20.     SOI-1 further stated that M-1 told him/her that AWADA was starting to get "greedy" and that "AWADA got fat pockets for dealing with my people." Your Affiant believes that M-1 was referring to his/her patients when s/he said "my people." SOI-1 explained that most of AWADA's patients received Roxicodone, Promethazine with Codeine, Xanax, and Lortab. SOI-1 stated that s/he believes that AWADA engages in questionable medical practices. SOI-1 stated that some of AWADA's questionable practices include charging a patient $300 for missing a stress test, charging for a nerve block when a pain injection was given, administering excessive X-rays (sometimes amounting to 100 or more X-rays a day in total), prescribing refills for Opana over the telephone and giving a prescription for Roxicodone to a 16 year old boy. SOI-1 has had a work association with AWADA and due to this association Investigators believe SOI-1 information is reliable. The information provided by SOI-1 is also corroborated and substantiated by other information contained in this affidavit, including other witness statements.

## C.   SOI-2

21.     In September 2011, during a debriefing of another source of information (SOI-2), SOI-2 stated that s/he knows M-1 and that M-1 was responsible for bringing in OxyContin patients to AWADA. SOI-2 also stated that M-1 brought approximately 10 patients per day to see AWADA. SOI-2 stated that s/he was affiliated with AWADA from January 2010 through February 2011. SOI-2 stated that M-1 told him/her that s/he was the "caregiver" for all the patients s/he brought into the practice. Your Affiant believes that M-1 was posing as a caregiver, in an attempt to avoid suspicion for his/her actions. SOI-2 also stated that the number of patients seen per day at AWADA's medical office increased as M-1 brought more and more patients. SOI-2 stated that s/he believes

that AWADA engages in questionable medical practices. SOI-2 stated that all new patients received an EKG, blood work, and a chest X-ray. SOI-2 stated that AWADA told him/her that "I know X-rays are a pain, but they are our money maker, what pays your check." SOI-2 has had a work association with AWADA and due to this association Investigators believe SOI-2 information is reliable. The information provided by SOI-2 is also corroborated and substantiated by other information contained in this affidavit, including other witness statements.

**D.    DEA CS-2**

22.    In March of 2012, during a debriefing of a DEA Confidential Source (CS-2), CS-2 stated that s/he knows AWADA and that AWADA is engaged in questionable medical practices. CS-2 stated that s/he observed these questionable medical practices from April 2011 through June 2011. CS-2 advised that AWADA mostly prescribed Opanas, Vicodin, Oxycodone, Xanax, Soma and Promethazine with Codeine. CS-2 said that when s/he questioned AWADA about the high drug use of Promethazine with Codeine, AWADA said that people like to mix it with Kool-Aid and drink it like a mixed drink.

23.    CS-2 stated that AWADA told patients that he was doing free work in the community, so patients would give their medications, both controlled and non-controlled drugs, to him for the poor. CS-2 stated that s/he did not know what AWADA was doing with the drugs, but s/he knew that AWADA was not doing free work in the community. CS-2 stated that there was a good-looking individual, who drove a black Cadillac Escalade who frequented AWADA's office. CS-2 stated that a patient approached C-2 and told him/her that the unidentified individual told them that s/he was a "runner." CS-2 stated s/he believed the individual to be a recruiter who brought in patients to see AWADA. CS-2 stated that most of the patients looked rough and homeless. CS-2 stated that AWADA did not examine those patients and that they walked out of the office with prescriptions for Schedule II controlled substance. CS-2 stated that this individual would also go inside the exam room with every patient s/he brought to the office. When CS-2 questioned AWADA about the individual, AWADA told CS-2 that s/he owns an adult care facility. CS-2 has had a work association with AWADA and due to this association

7

Investigators believe CS-2's information is reliable. The information provided by CS-2 is also corroborated and substantiated by other information contained in this affidavit including, witness statements and surveillance.

## IV.   UNDERCOVER OPERATIONS

### A.   January 12, 2012 (UC-1 & CS-3)

24.   On January 12, 2012, a DEA Task Force Officer, acting in an undercover capacity (UC-1), had an office visit with AWADA at MIDWEST-1. During the visit, UC-1 received a prescription from AWADA for Hydrocodone-Acetaminophen 7.5-750mg. A Confidential Source (CS-3) also accompanied UC-1 on this visit. CS-3 told the female receptionist that s/he would pay $900.00 for the visit and advised her that CS-3 was paying for himself/herself and UC-1, $450.00 for each. CS-3 handed the receptionist $900.00. CS-3 stated that s/he had no health issues on the medical history form. UC-1 was weighed and had his/her blood pressure taken by a nurse and UC-1 told the nurse s/he had stiffness in his/her back. UC-1 was then directed to have X-rays taken. UC-1 noted that s/he had at least 5 X-rays done. AWADA then asked UC-1 what his/her problem was and pointed out that it had been over a year since UC-1 had any pain medications. AWADA then examined UC-1 by having him/her sit on the table in order to examine his/her back. AWADA asked UC-1 if s/he had ever been on Vicodin or Tylenol with Codeine. UC-1 responded, "Just from buddies on the street and I've taken Roxi...that's what I kind of was hoping to get today." AWADA told UC-1, "It's not that kind of pharmacy here." AWADA then wrote UC-1 a prescription for Vicodin ES, 120 dosage units and told UC-1 that s/he should get an MRI done.

25.   UC-1 was accompanied by CS-3 on January 12, 2012. CS-3, who was also a new patient, never had any vitals taken by the nurse. CS-3 told AWADA that s/he was there because of an "old car injury, it flares up." AWADA asked CS-3 if s/he had an MRI and CS-3 responded that s/he had one from a different doctor last year. AWADA asked CS-3 what medicine s/he was refilling and CS-3 stated, "I want Roxi 30s." AWADA then said, "one at night, then bump you up later..." When CS-3 pleaded with AWADA, "ok, twice a day, come on man." AWADA responded, "I don't mind doing

8

twice a day, kinda stressing you about it." AWADA then had CS-3 turn his/her head back and forth and told CS-3 to get an MRI. After CS-3 told AWADA that s/he was going to bring three people to see him next week in an effort to get the office visit reduced, AWADA stated, "That's the price across the board." AWADA then prescribed CS-3 Roxicodone 30mg, 60 dosage units.

**B.     January 25, 2012 (CS-3)**

26.     On January 25, 2012, Investigators attempted to have CS-3 see AWADA at MIDWEST-1 about a prescription written by AWADA that could not be filled at several pharmacies. AWADA's office employees advised that CS-3 would have to pay another office visit fee in order to see AWADA about the prescription. This office procedure was consistent with what other sources of information had advised about the practice at MIDWEST-1.

**C.     February 13, 2012 (UC-1, CS-3 & UC-2)**

27.     On February 13, 2012, UC-1 had an office visit with AWADA at MIDWEST-1. During the visit, UC-1 received prescriptions from AWADA for Oxycodone 30mg, 60 dosage units, Lortab 5mg/500, 120 dosage units, and Valium 10mg, 30 dosage units. UC-1 was also accompanied by CS-3, and an undercover DEA Agent (UC-2). CS-3 told the receptionist that s/he was paying for himself/herself, UC-1 and UC-2. CS-3 then paid the receptionist $1,350.00 for their medical visits. The nurse took UC-1's weight and blood pressure and asked if s/he needed a refill on his/her Vicodin. UC-1 advised that s/he did but hoped that AWADA would "up" the prescription to something else. The nurse filled out the prescription and put it with the UC-1's chart. UC-1 then was instructed to get more X-rays even though UC-1 told nurse that s/he had X-rays on the last visit. UC-1 then had about seven X-rays of his/her back taken.

28.     During UC-1's visit on February 13, 2012, AWADA told UC-1 that he was moving to a new building and had put $17 million into the project already. UC-1 then told doctor that s/he was from Florida and had been getting "Roxis" and wanted to be "bumped up," from Vicodin to Roxicodone. AWADA then conducted a short exam on

9

the UC-1's back. In response to UC-1's questioning about his/her X-ray, AWADA advised that there is some "narrowing on the discs spaces L-5 and S-1." UC-1 told AWADA that s/he didn't like the way the "Vics" made his/her stomach feel, and preferred the Roxicodone over the Vicodin. AWADA said that he could "bump (UC-1) up on that pain scale." UC-1 also asked about Xanax for sleeping at night. AWADA told UC-1 that Xanax was "powerful stuff" and that UC-1 might want to try Ambien first. AWADA told UC-1 that he was going to give him/her a prescription for Lortab, since it was easier on the stomach and said, "I will give you some Oxycodone to use only for maintenance therapy." AWADA further explained that Oxycodone is very powerful and an extremely habit-forming narcotic. AWADA told UC-1 that he would eventually have some blood work done, especially since he was prescribing a Schedule II medication. At the end of the visit, AWADA told UC-1, "So your pain on a scale of ten is a ten out of ten right now?" UC-1 felt compelled to answer, "Yes."

29.     On February 13, 2012, CS-3 was also seen by AWADA who prescribed CS-3 Roxicodone 30mg, 90 dosage units, Lortab 500mg, 120 dosage units and Xanax 2mg, 30 dosage units. AWADA asked CS-3 if his/her pain was still bad. CS-3 stated, "Yes." CS-3 told AWADA that s/he had to drive to a pharmacy in Toledo, Ohio to have the prescriptions filled. CS-3 told AWADA that s/he was a business person and that s/he brought in two people for AWADA to see. CS-3 also told AWADA that s/he paid cash for them and that they needed prescriptions for "Roxi." AWADA told CS-3 that he just seen UC-1 and s/he received a prescription for Roxi. CS-3 also told AWADA to make sure that UC-2 receives Roxi too. AWADA then asked CS-3 if UC-2 was in a lot of pain. CS-3 stated that UC-2 was in the same amount of pain as CS-3. CS-3 stated that AWADA did not touch him/her during the visit. CS-3 stated that AWADA did not mention the X-rays s/he had taken during the visit nor did AWADA mention anything related to an MRI. AWADA also did not bring up anything related to CS-3's Michigan Automated Prescription System (MAPS) report and CS-3 did not fill out a pain chart either.

30.     Also on February 13, 2012, UC-2 received prescriptions from AWADA for Roxicodone 30mg, 60 dosage units, and Vicodin ES, 60 dosage units. This was UC-2's first office visit with AWADA. UC-2 wrote that s/he had lower back issues on the patient registration form and indicated on his/her pain assessment form that this pain was a level 3. UC-2 was weighed and had his/her blood pressure taken by the nurse. The nurse then took UC-2 to have about 5 X-rays done on his/her back. When AWADA asked about UC-2's back pain, UC-2 said s/he had pain for a little over a year. AWADA then spoke about UC-2's X-ray and indicated that they "look pretty good." AWADA then performed a cursory examination where he pushed on different spots on UC-2's back. AWADA told UC-2 that his/her back was pretty tight. When AWADA asked UC-2 what medications s/he had been taking, UC-2 responded, "I take Roxis whenever I can get them." In response to AWADA's question to UC-2 about how often s/he takes Roxicodone, UC-2 also told AWADA, "six months off and on because I don't have a doctor, so I get them off the street." AWADA then wrote UC-2 the prescriptions for Roxicodone 30mg, and Vicodin ES. He also told UC-2 to "be careful because Roxicodone has a very high level of dependence."

### D.      March 14, 2012 (UC-2 & CS-3)

31.     On March 14, 2012, UC-2 had an office visit with AWADA at MIDWEST-1. During the visit, UC-2 received prescriptions for Vicodin ES, 120 dosage units. CS-3 also accompanied UC-2 on this visit. CS-3 paid $300 for himself/herself and UC-2. CS-3 asked the receptionist why the fee was only $300 and the female stated that she did not know. The nurse then took UC-2's weight and blood pressure. The nurse advised UC-2 that AWADA was not prescribing Roxicodone anymore. When AWADA came into the room, UC-2 stated that his back was hurting, and AWADA replied, "Everybody's back is hurting; my back is hurting, since I woke up this morning." AWADA then did a cursory exam of UC-2's back. AWADA then told CS-3, "By the way, I want to tell you the last time I think when I saw you, you got prescribed some Roxicodone, and our practice has taken a different position away from pain management. We are not prescribing Roxicodone anymore to our patients...I don't want my practice to be fully 100 percent pain." AWADA told UC-2 that he spoke to two pain specialists and both doctors would

be willing to see UC-2. AWADA further asked UC-2, "Did the Roxicodone help?  I mean is it the end-all be-all medication?" UC-2 stated, "Just a little…bit."

32.     On March 14, 2012, CS-3 was also seen by AWADA.  The nurse took CS-3's blood pressure, pulse, and weight.  CS-3 told the nurse that s/he was there to receive a refill for a "Roxi" prescription.  The nurse told CS-3 that AWADA was not doing that anymore.  When AWADA came in the room to see CS-3, he told CS-3 that he would no longer be practicing in pain management but was going to focus on family medicine instead.  AWADA did not physically touch CS-3 nor perform an exam on CS-3.  CS-3 did not receive a prescription from AWADA.  AWADA also referred CS-3 to a different pain management clinic.  Your Affiant believes that AWADA had been tipped off to the DEA's investigation and was subsequently trying to change his prescribing habits to appear more legitimate.  The belief that AWADA had been tipped off to the investigation is supported by statements made by AWADA to M-1 and is further explored later in this affidavit.

### E.     April 25, 2012 (CS-2)

33.     On April 25, 2012, CS-2, an unlicensed physician's assistant, met with AWADA at MIDWEST-2.  During the conversation, AWADA told CS-2 that he has not prescribed any Schedule IIs in over a year.  AWADA told CS-2, "For about 3 months, I was helping some patients with medications that we probably shouldn't have been."  AWADA told CS-2 that he will just leave signed scripts for him/her to use at the office.  AWADA also discussed the street prices of Opana and how another doctor was writing large amounts to patients.  When CS-2 asked AWADA about a marketer from MIDWEST-1, AWADA identified M-1 by name.

### F.     July 18, 2012 (CS-3)

34.     On July 18, 2012, CS-3 had an office visit with AWADA at the MIDWEST-2.  CS-3 signed-in at the front desk and paid $95 to the receptionist.  CS-3 had his/her blood pressure, pulse, and temperature taken by the nurse.  CS-3 also was told by a nurse/doctor assistant that AWADA was not writing prescriptions for Roxicodone.  AWADA did not

physically touch CS-3 nor provide any type of exam. AWADA instructed CS-3 to receive an MRI and told CS-3 that there was a pain management facility directly across the hall from AWADA's current office. CS-3 received a referral for an MRI and prescriptions for Baclofen, 10mg, 120 dosage units and Naprosyn, 500mg, 60 dosage units.

## G.   September 20, 2012 (CS-4 & UC-3)

35.     On September 20, 2012, a DEA Confidential Source (CS-4) accompanied by an undercover DEA task force officer (UC-3) had an office visit with LUIS COLLAZO, MD (COLLAZO) at MIDWEST-1. During the office visit, CS-4 and UC-3 paid $450 each for the unscheduled visit. CS-4 had his/her blood pressure taken and was given approximately three X-rays. CS-4 complained to COLLAZO about pain in his/her neck, right arm, and right side back. CS-4 told COLLAZO that s/he had had an MRI done about three years prior that showed s/he had a herniated disc and a pinched nerve is his/her back. After much discussion where COLLAZO told CS-4 that s/he did not believe his/her story about the pain s/he was in, COLLAZO still prescribed CS-4 45 pills of Oxycodone 30mg.

36.     UC-3 also saw COLLAZO on September 20, 2012. UC-3's visit began with UC-3 filling out medical history paperwork where s/he indicated that s/he had no medical ailments. UC-3 told COLLAZO that s/he had "a little soreness in my back, a little stiffness in my lower back." UC-3 marked his/her pain level at three out of ten on the pain scale. COLLAZO had UC-3 perform a variety of tests including walking on his/her tip toes, walking on his/her heels, and bending over at the waist after which UC-3 his/her back was only "a li'l stiff when I come back up." COLLAZO asked UC-3 "What do you normally do?" to which UC-3 replied, "Um, actually from my buddies I get some Roxis." UC-3 also told COLLAZO that his/her buddies used to see AWADA at MIDWEST-1 and COLLAZO stated that s/he was leasing the building from AWADA. COLLAZO prescribed UC-3 45 pills of Motrin 400mg and 30 pills of Oxycodone 30mg.

## V.   TRASH COLLECTIONS

37.    Investigators conducted several trash collections at M-1's residence (Residence-1) in southeast Michigan on the following dates which yielded the following information and evidence:

### A.    M-1's Residence-1 – November 10, 2011

38.    Twenty empty prescription bottles for Oxycodone 30mg were recovered, none of which were prescribed to M-1 or residents of the home.  All twenty of the empty prescription bottles were prescribed by AWADA.

39.    The names found on the empty prescription bottles for Oxycodone 30mg were run in the Medicare Part D claims database.  Analysis of this database reveals that Medicare paid $1,439.32 for fourteen of the prescriptions which accounted for 2,250 Oxycodone 30mg pills.  The summary chart below illustrates the claims for each of the fourteen prescriptions billed to Medicare.

| November 10, 2011 Trash Pull – M-1's Residence-1 | | | | | | |
|---|---|---|---|---|---|---|
| Prescription Narcotics Found in M-1's Trash and Paid For by Medicare | | | | | | |
| Name | Date | Drug Name | Units | Pharmacy | Paid Amt | Insurance |
| A.S. | 11/3/2011 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $65.94 | Medicare Part D |
| B.D. | 11/1/2011 | Oxycodone HCl Tab 30 MG | 180 | WALGREENS #5322 | $107.00 | Medicare Part D |
| B.W. | 11/2/2011 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $80.88 | Medicare Part D |
| C.Y. | 11/1/2011 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $73.89 | Medicare Part D |
| D.K. | 11/4/2011 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $73.89 | Medicare Part D |
| E.H. | 11/2/2011 | Oxycodone HCl Tab 30 MG | 180 | WALGREENS #5322 | $80.88 | Medicare Part D |
| L.C. | 11/2/2011 | Oxycodone HCl Tab 30 MG | 180 | WALGREENS #5322 | $80.88 | Medicare Part D |
| L.H. | 10/31/2011 | Oxycodone HCl Tab 30 MG | 180 | WALGREENS #5322 | $118.25 | Medicare Part D |
| M.M. | 11/2/2011 | Oxycodone HCl Tab 30 MG | 180 | WALGREENS #4660 | $216.43 | Medicare Part D |
| N.G. | 10/31/2011 | Oxycodone HCl Tab 30 MG | 180 | WALGREENS #5322 | $118.25 | Medicare Part D |
| O.G. | 11/2/2011 | Oxycodone HCl Tab 30 MG | 180 | WALGREENS #5322 | $107.00 | Medicare Part D |
| U.S. | 11/2/2011 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $77.80 | Medicare Part D |
| V.P. | 11/4/2011 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $80.88 | Medicare Part D |
| Y.F. | 11/3/2011 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $157.35 | Medicare Part D |
| | | Total Units: | 2,520 | Total Paid: | $1,439.32 | |

14

**B.      M-1's Residence-1 – February 2, 2012**

40.      Sixteen empty prescription bottles for Oxycodone 30mg were recovered, none of which were prescribed to M-1 or residents of the home.  All sixteen of the empty pill bottles had been prescribed by AWADA.  Investigators also collected thirty empty prescription bottles with the labels removed.

41.      The names found on the empty prescription bottles for Oxycodone 30mg were run in the Medicare Part D claims database.  Analysis of this database reveals that Medicare paid $1,192.26 for thirteen of the prescriptions, which accounted for 2,340 Oxycodone 30mg pills.  The following summary chart illustrates the claims for each of the thirteen prescriptions billed to Medicare.

| February 2, 2012 Trash Pull – M-1's Residence-1 | | | | | | |
|---|---|---|---|---|---|---|
| Prescription Narcotics Found in M-1's Trash and Paid For by Medicare | | | | | | |
| Name | Date | Drug Name | Units | Pharmacy | Paid Amt | Insurance |
| E.H. | 1/25/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $80.88 | Medicare Part D |
| V.B. | 1/25/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $94.88 | Medicare Part D |
| W.M. | 1/24/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $80.88 | Medicare Part D |
| Y.F. | 1/25/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $121.82 | Medicare Part D |
| M.S. | 1/23/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $80.88 | Medicare Part D |
| L.C. | 1/23/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $80.88 | Medicare Part D |
| A.S. | 1/23/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $80.88 | Medicare Part D |
| C.Y. | 1/23/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $74.23 | Medicare Part D |
| B.W. | 1/26/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $80.88 | Medicare Part D |
| S.W. | 1/26/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $132.47 | Medicare Part D |
| J.M. | 1/24/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $80.88 | Medicare Part D |
| M.T. | 1/26/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $121.82 | Medicare Part D |
| V.P. | 1/24/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $80.88 | Medicare Part D |
| | | Total Units: | 2,340 | Total Paid: | $1,192.26 | |

**C.      M-1's Residence-1 – February 16, 2012**

42.      Twenty-four empty prescription bottles for Oxycodone 30mg were recovered, none of which were prescribed to M-1 or residents of the home.  All twenty-four pill bottles were prescribed by AWADA.  Investigators also collected fifteen empty prescription bottles with the labels removed and eight prescription bottles filled with non-

controlled medications. The fifteen empty prescription bottles with missing labels were not traceable. The eight prescription bottles filled with non-controlled medications were prescribed by AWADA and none were prescribed to M-1 or residents of the home.

43.     The names found on the empty prescription bottles for Oxycodone 30mg were run in the Medicare Part D claims database. Analysis of this database reveals that Medicare paid $1,338.06 for thirteen of the prescriptions, which accounted for 2,340 Oxycodone 30mg pills. The summary chart below illustrates the claims for each of the thirteen prescriptions billed to Medicare.

| | | February 16, 2012 Trash Pull – M-1's Residence-1 | | | | |
|---|---|---|---|---|---|---|
| | | Prescription Narcotics Found in M-1's Trash and Paid For by Medicare | | | | |
| Name | Date | Drug Name | Units | Pharmacy | Paid Amt | Insurance |
| A.M. | 2/6/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $80.88 | Medicare Part D |
| A.B. | 2/6/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $137.55 | Medicare Part D |
| B.D. | 2/6/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $94.88 | Medicare Part D |
| B.W. | 2/6/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $121.82 | Medicare Part D |
| C.B. | 2/6/2012 | Oxycodone HCl Tab 30 MG | 180 | WALGREENS #5322 | $121.82 | Medicare Part D |
| D.K. | 2/8/2012 | Oxycodone HCl Tab 30 MG | 180 | WALGREENS #5322 | $74.63 | Medicare Part D |
| D.K. | 2/6/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $74.23 | Medicare Part D |
| J.R. | 2/6/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $121.82 | Medicare Part D |
| L.H. | 2/6/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $118.00 | Medicare Part D |
| P.C. | 2/8/2012 | Oxycodone HCl Tab 30 MG | 180 | WALGREENS #5322 | $121.82 | Medicare Part D |
| R.P. | 2/7/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $80.88 | Medicare Part D |
| U.S. | 2/6/2012 | Oxycodone HCl Tab 30 MG | 180 | MEDICAP PHARMACY | $71.73 | Medicare Part D |
| V.G. | 2/7/2012 | Oxycodone HCl Tab 30 MG | 180 | WALGREENS #5322 | $118.00 | Medicare Part D |
| | | Total Units: | 2,340 | Total Paid: | $1,338.06 | |

44.     Of the empty Oxycodone 30mg bottles discovered during trash collections at M-1's residence on the above three dates, Medicare paid a total of $3,969.64 for 40 prescriptions, which accounted for 6,930 Oxycodone 30mg pills. Additionally, all of the pill bottles located in the trash on these three dates had been prescribed by AWADA.

### D.      M-1's Residence-1 – April 5, 2012

45.      Four Medicap Pharmacy prescription receipt stickers for M-1 at a different southeast Michigan address dated March 20, 2012, were recovered.  The receipt stickers listed the following prescriptions: (1) Prednisone 20mg 10 tablets; (2) Vicodin ES 120 tablets; (3) Promethazine with Codeine; and (4) Keflex 500mg, 30 capsules.  All of the receipts had AWADA's name printed on them.

### E.      M-1's Residence-1 – April 12, 2012

46.      Two prescriptions from AWADA were recovered.  The first prescription, dated February 18, 2012, was for patient A.H. for 120 Oxycodone 30mg and the second prescription, dated January 19, 2012, was prescribed to M-1 for Promethazine with Codeine.  Investigators also collected two receipts from Walgreens Pharmacy, one dated February 7, 2012, for patient V.G. for 180 Oxycodone 30mg and one for 90 Clonidine 3mg, dated February 7, 2012, for patient G.M.  Investigators also collected residency papers for M-1.

## VI.      ARREST OF M-1 AND SEARCH WARRANTS

47.      On August 27, 2012, M-1 was arrested and a written prescription for Vicodin in the name of another patient, R.P., was found in M-1's wallet.   The prescription was dated August 14, 2012, and was prescribed by COLLAZO out of MIDWEST-1's address.  COLLAZO is currently conducting his/her medical practice out of MIDWEST-1 which was the office that was previously utilized by AWADA.  Based upon information from witness interviews, however, your Affiant believes that AWADA is still controlling the activities at MIDWEST-1.  A review of AWADA's bank accounts uncovered a check from AWADA drawn on the Comerica Bank checking account for MIDWEST made payable to COLLAZO in the amount of $526.00.  The check is dated August 15, 2012, and the notation on the memo line says "Salary – coverage."

48.      On August 27, 2012, Investigators searched M-1's vehicle pursuant to an authorized search warrant, and seized the following items:   one prescription bottle containing 29 tablets of Oxymorphone HCL ER 15mg, one prescription bottle containing

17

89 tablets of Oxymorphone HCL ER 15mg, and one prescription bottle containing Loratadine 10mg pills. All of the prescriptions were in M-1's name and prescribed by AWADA.

49.     On August 27, 2012, Investigators searched two residences (Residence-1 and Residence-2) belonging to M-1 pursuant to authorized search warrants and seized several items of evidence including but not limited to the following:

**A.     M-1's Residence-1**

50.     $30,080.00 U.S. Currency; two bank withdrawal receipts for $20,000 and $25,000;   one prescription bottle containing twenty-five tablets of Alprazolam 2mg (Schedule III) with the name T.H. printed on the bottle and prescribed by AWADA; one prescription bottle containing sixty-three tablets of Alprazolam 2mg (Schedule III) with the M-1's name printed on the bottle; one prescription bottle containing capsules of Keflex 500mg with the name W.M. printed on the bottle, dated January 24, 2012, and prescribed by AWADA; one prescription bottle containing tablets of  Ibuprofen 800mg with M-1's name printed on the bottle, dated February 9, 2012, and prescribed by AWADA;   one baggie containing multiple tan tablets marked as Seroquel; one prescription bottle containing tablets of Lisinopril 20mg with the name R.P. printed on the bottle,  dated August 4, 2012, and prescribed by COLLAZO; one prescription bottle containing tablets of Clonidine HCL .1mg with the name C.L. printed on the bottle, dated August 8, 2012, and prescribed by COLLAZO; one prescription bottle containing tablets of Seroquel 50mg with the name S.C. printed on the bottle, dated May 9, 2011, and prescribed by AWADA; one empty prescription bottle containing Oxycodone  with M-1's name written on the bottle, dated February 9, 2012, and prescribed by AWADA; and a shoebox containing multiple prescription bottles of non-controlled medications all prescribed by AWADA.

**B.     M-1's Residence-2**

51.     One   patient receipt dated January 16, 2012,   in the name of E.C. from MIDWEST-1;  $12,138.00 U.S. Currency; one prescription bottle containing fifty-eight

dosage units of Cephalexin 500mg with the name C.J. printed on the bottle with a date of February 27, 2012; one empty prescription bottle of Oxycodone HLC 30mg with M-1's name printed on the label and dated December 9, 2011; one box containing Ventolin HFA inhaler with the name D.R. printed and dated   January 18, 2012; two boxes of ProAir Inhaler 8.5 gm with the name D.W. printed on the front of the box and dated January 16, 2012; one prescription bottle containing Cephalexin Cap 500mg with M-1's name printed on the label with a date of  January 4, 2012; one empty prescription bottle containing Promethazine with Codeine Syrup with the name T.H. printed on the label and prescribed on September 9, 2012; one prescription box of Pro Air inhaler 8.5 gm with the name C.K. and prescribed on September 27, 2011; four prescriptions in the name C.K. for   Metformin   1000mg   tablets,   Simvastatin   20mg   tablets,   Hydrocodone/Apap 10mg/500mg tablets, ProAir Inhaler 8.5 gm,  one box containing a ProAir  Inhaler 8.5 gm with the name T.H. printed on the front of the label.  All of the above prescriptions that were seized at Residence-2 were written by AWADA.

## VII.   INTERVIEW OF M-1

52.    On October 3, 2012, Investigators conducted an interview of M-1.   M-1 had worked as a patient recruiter/marketer since September 2008 for a few home health care companies in southeast Michigan that paid him/her hundreds of dollars per patient that s/he recruited to their business.  In the later part of 2010, M-1 was informed by a patient, that M-1 had recruited, about AWADA's medical practice in Warren, Michigan writing OxyContin prescriptions.  M-1 was told by the patient that "AWADA is cool and he is a writer."

53.    After receiving the above information, M-1 called AWADA's office, MIDWEST-1, and set up an appointment to see AWADA as a patient.  M-1 first met AWADA in the fall of 2010 as a patient.  After MARKTER-1's third visit in and around November or December 2010, AWADA asked M-1 about bringing patients into his practice.  AWADA began the conversation by telling M-1 that he thought s/he was a nice dresser and asked what M-1 did for a living.  M-1 told AWADA that s/he was a patient recruiter/marketer for home health agencies.  AWADA asked M-1 what home health agency M-1 worked

19

for, whether s/he had access to those patients, and how many patients per month s/he could bring into AWADA's office. M-1 told AWADA that s/he could probably bring fifteen to twenty patients into his practice each month.

54.     During this same conversation in and around November or December 2010, AWADA asked M-1 if s/he knew what OxyContin was and how much it was going for on the street. At first M-1 lied to AWADA and said that OxyContin was going for $8 or $9 (per pill) on the street. According to M-1, AWADA actually called him/her out on the lie and said that he knew that OxyContin was going for $30 (per pill) on the street. M-1 and AWADA then had more conversation regarding the various street values of OxyContin after which AWADA told M-1 to bring the patients s/he had access to and AWADA would write OxyContin prescriptions for M-1's patients.

55.     Before agreeing to bring in patients to AWADA's practice, M-1 asked AWADA what was in it for him/her. According to M-1, AWADA told M-1 that he would write the OxyContin prescriptions as well as prescriptions for Promethazine with Codeine, Vicodin/Lortab along with maintenance medications for M-1's patients. In return for writing those prescriptions, M-1 would pay AWADA in cash each week. The payment to AWADA would depend on the number of prescriptions AWADA wrote and the number of OxyContin pills in each prescription.

56.     For M-1's patients, AWADA started writing OxyContin 80mg prescriptions for 60 to 90 pill quantities. Around January 2011, the OxyContin 80mg pills started "gelling up" due to reformulations. This new reformulation was not good for people looking to buy or sell the pills on the street. M-1 brought this problem to AWADA's attention to which AWADA asked him/her "what are we going to do?" M-1 found out that he could sell Roxicodone 30mg pills in place of the OxyContin 80mg pills. M-1 brought this information to AWADA but it seemed to M-1 that AWADA already knew Roxicodone 30mg pills would be the next logical step after OxyContin 80mg. M-1 estimated that AWADA had already written OxyContin 80mg prescriptions for fifteen to twenty of M-1's patients before switching over to Roxicodone 30mg prescriptions.

57.    AWADA started writing 90 pill prescriptions of Roxicodone 30mg for M-1's patients.  AWADA soon started increasing the number of pills on each prescription to 120, 140, 150, 180, and finally 240.  As AWADA increased the number of pills on each prescription he demanded more money from M-1.  By the time AWADA was writing 240 pill prescriptions he was charging M-1 approximately $50,000 each month.

58.    M-1 paid AWADA in cash on a weekly basis.  AWADA would call M-1 and tell him to come see him at the office on a Mondays or Tuesdays.  M-1 normally paid AWADA at his office.  AWADA wanted the cash to be in all $100s.  M-1 does not know where AWADA kept the cash that s/he gave to AWADA.

59.    A review of AWADA's/MIDWEST's Bank of America account from November 2010 through December 2011 showed that MIDWEST averaged approximately $12,000 per month in cash deposits with none being over $20,000.  After AWADA closed the Bank of America account, he utilized an account at Comerica Bank.  Analysis of the Comerica Bank account for AWADA/MIDWEST shows average monthly cash deposits of just over $12,000 from March 2012 through July 2012.  Only in August 2012 does the cash deposited exceed $20,000 ($20,758.37) and the cash deposits in September 2012 totaled approximately $43,781.80.  Additionally, AWADA's cash deposits into his Bank of America account prior to his dealings with M-1, from July 2010 through October 2010 also averaged just under $12,000 as well.  Your Affiant believes, based upon the financial analysis of the bank accounts associated with AWADA and MIDWEST that AWADA did not deposit the cash he was paid by M-1 into the bank accounts.

60.    Your Affiant believes that AWADA has concealed a significant portion of the cash payments that M-1 made to AWADA over the course of their drug diversion activities, to include secreting the cash inside of his own residence.  Investigators received information from another Source of Information (SOI-3) during an interview in August 2012 that AWADA kept significant amounts of cash in his home located at 1929 North Vermont Avenue, Royal Oak, Michigan 48073.  SOI-3 stated that s/he had last

21

seen AWADA in October 2011. SOI-3 stated that s/he observed "thousands" laid out in AWADA's basement and had heard from another Source of Information (SOI-4) that SOI-4 had observed over a million dollars in cash at AWADA's home. Both CS-3 and CS-4 informed Investigators during interviews conducted in August 2012 that AWADA had shipped furniture in a storage container filled with cash to Lebanon. The above information was given to Investigators during interviews with SOI-3 and SOI-4 in the context of AWADA's medical practice. The information provided by SOI-3 and SOI-4 that AWADA did not deposit the cash proceeds of his drug diversion activities is further supported by the statements made by M-1 and the review of banking records mentioned previously.

61.     When M-1 and AWADA's business relationship first started, AWADA wrote Roxicodone 30mg prescriptions for 90 pills and asked M-1 to pay him a couple thousand dollars. As AWADA kept increasing the number of pills he wrote in each Roxicodone 30mg prescription, he increased the amount of money he requested from M-1. When AWADA wrote Roxicodone 30mg prescriptions for 140 pills, he asked for $4,000 each week. By the time AWADA was writing Roxicodone 30mg prescriptions for 240 pills, he was asking for $12,000 to $13,000 each week. When M-1 asked AWADA about the increasing prices, AWADA would tell M-1 that "you gotta take care of the good doctor" and that the prices were justified because AWADA was putting his medical license on the line.

62.     In addition to getting paid in cash by M-1, AWADA preferred that M-1 bring him patients that had "red, white and blue" cards (i.e., Medicare health insurance cards). For all of M-1's Medicare patients, AWADA would order X-rays and shots. After M-1's Medicare patients were no longer considered new patients, AWADA began conjuring up operations/services that he would bill Medicare for but not provide to M-1's patients. According to M-1, AWADA would come into the exam room and tell a patient "I'm performing a surgery on you today" or "You received these shots today." AWADA, however, would not provide these services. Rather, AWADA had M-1's patients sign a sheet stating that they received the services they never actually received. Some of M-1's

patients received bills for these services that AWADA never performed, which made them mad. When M-1 came to AWADA with this issue, AWADA stated that he did not want patients with Great Lakes Health or Medicaid insurance plans. AWADA only wanted patients with Medicare Parts A and B because "it paid." AWADA was also fine with patients that had Blue Cross Blue Shield.

63.    M-1 stated that AWADA ordered X-rays and "bogus" procedures for everyone. AWADA told M-1 and M-1's patients that, since he was writing controlled substance prescriptions for them, in return he would bill for services that he did not perform. AWADA told the patients what services he was billing for and not providing, just in case Medicare called. That way, M-1's patients would not be caught off-guard and would know to tell Medicare that AWADA did provide the services he billed for. Some of M-1's patients were getting bills because Medicare started refusing to pay for some of the services that AWADA was billing for but not providing. Some of M-1's patients threatened to call Medicare on AWADA for his billing of services that he never provided.

64.    AWADA also wrote Roxicodone and Vicodin prescriptions for M-1. AWADA would tell M-1 that in return for writing those prescriptions, he was going to bill M-1's health insurance (HAP) for a surgery and/or procedure that he didn't actually provide. M-1 thinks AWADA did that twice before M-1's insurance rejected those surgery/procedure claims.

65.    M-1 reiterated that AWADA would bill M-1's patients' Medicare for neck, back, and whole body X-rays. One month AWADA might bill Medicare for X-rays, the next month AWADA might bill Medicare for a surgical procedure that he never provided, and the following month AWADA might bill for X-rays again. AWADA also started ordering stress tests for all of M-1's Medicare patients. These stress tests would take place at an imaging center that was not affiliated with AWADA's office. The imaging center was located on Van Dyke Road between 14 Mile Road and 15 Mile Road. AWADA wanted M-1 to bring the patients s/he controls to get stress tests. AWADA told M-1 that he (AWADA) was getting paid $300 for each patient referred for stress tests. In

23

addition to the X-rays and stress tests, AWADA also started pushing sleep studies for M-1's patients. M-1 estimates that s/he controlled upwards of 100 patients rotating through AWADA's office.

66.     On a typical day, M-1 would call AWADA's office and tell the staff the names of patients s/he was bringing in that day. AWADA had his staff thinking that M-1 owned a nursing company. M-1 typically brought in four to five patients each day. M-1 averaged about fifteen patients each week. M-1 called patients in the morning and usually picked each patient up where they lived. M-1 drove an SUV that fit five people. If s/he ended up having more, s/he put people in the trunk area. Some patients told M-1 when s/he picked them up that they had a friend that also wanted to see AWADA and that their friend had a "red, white and blue" (Medicare) card. If M-1 could fit those extra patients in the car then s/he would take them along. If not, then s/he would try to bring them to AWADA's office later in the day or the next day.

67.     When M-1 arrived at AWADA's office, the patient charts were out and waiting for him/her. If M-1's patients required co-pays, M-1 paid them. M-1 filled out the personal history forms for each of his/her patients including their prescription drugs, both controlled and non-controlled.   M-1 listed Roxicodone 30mg, Promethazine with Codeine, and Vicodin/Lortab, along with any maintenance drugs. AWADA did not always write prescriptions for Promethazine with Codeine, but he would always write prescriptions for Roxicodone 30mg and Vicodin/Lortab.   According to M-1, the maintenance drugs s/he wrote down for each patient were legitimate prescriptions. The Roxicodone 30mg, Promethazine with Codeine, and Vicodin/Lortab prescriptions were not legitimate prescriptions.

68.     M-1 said s/he usually sat in the exam room when patients s/he controlled were seen by AWADA. M-1 was in the exam room when his/her patients had their blood pressure checked and blood work done. AWADA would come into the exam room and directly ask M-1, "What are we writing?" If M-1 could not be in the exam room with one of his/her patients, s/he would have them tell AWADA that they are with M-1. After

24

getting the prescription from AWADA, M-1 said that he would then go right to a pharmacy.

69.    For new patients, M-1 sat in the exam room 100% of the time. That was because AWADA wanted to make sure that the patients were with M-1. For all of M-1's new patients, AWADA wrote out the prescriptions himself. Prescriptions AWADA wrote for M-1's new patients were different. For example, AWADA wrote prescriptions for anywhere from 90 to 150 Roxicodone 30mg pills. For M-1's established patients, the office visits were basically the same routine as for the new patients. M-1 was usually in the exam room with each established patient. However, the nurse and/or medical assistant wrote out the established patient's prescription and left it to be signed by AWADA. AWADA ran MAPS for M-1's established patients. It did not matter what the MAPS reports showed because AWADA still gave the established patients their prescriptions, including the patients working with other marketers and getting controlled prescriptions from other doctors. M-1 said that AWADA sometimes handed the prescription directly to the patient and sometimes AWADA handed it directly to M-1.

70.    AWADA ran MAPS reports on each of M-1's patients and pointed out to M-1 whether one of his/her patients had recently filled a prescription for controlled medications from another physician. For example, if one of M-1's patients recently received 90 Vicodin pills and 40 Roxicodone pills from another doctor, AWADA would tell M-1 that it was okay and AWADA would write a reduced quantity of 120 or 140 Roxicodone pills instead of a full prescription of 180 pills. Regarding the patients s/he controlled, M-1 said that, "if their MAPS were dirty, it didn't matter to AWADA."

71.    Patient files were located in the basement of AWADA's MIDWEST-1 office. M-1's name was marked on patient files for patients that s/he controlled although it didn't matter if the files were marked because AWADA knew which patients M-1 controlled.

72.    AWADA constantly pushed M-1 to bring in more patients. He told M-1 on several occasions, "I need new patients." AWADA always talked to M-1 about the new

office complex he was building and how much it cost, anywhere from $5 million to $20 million. In the course of conversations regarding how much the new office complex was going to cost, AWADA told M-1, "You're going to have to pay the doc more money."

73.     AWADA told M-1 that he had $20 million stashed away.  AWADA never mentioned to M-1 about whether he was taking loans from the bank or other third parties for his new medical office building.  AWADA and M-1 talked on the telephone and texted back and forth.  Usually it was AWADA asking M-1 to bring him more patients. For example, AWADA would say "bring me some patients, I'm hurting" or AWADA would call M-1 and ask if s/he was coming into the office that day and asked how many people M-1 was bringing in.  If AWADA thought M-1 owed him money for patients he had written prescriptions for, AWADA would text him/her about that too.  In general, M-1 said their telephone conversations were not long.  Most of their lengthy conversations took place face-to-face at AWADA's office.

74.     Around November 2011 M-1 "stepped away" from AWADA and stated two reasons for doing so.  The first reason was that AWADA's office was "getting too hot" and that "it was wild" over at AWADA's office.  M-1 attributed that to the fact that AWADA was bringing in as many patients as he could to generate more billings and get more money to build his new medical office.  The second reason was that the patients M-1 controlled began "turning" on M-1 by going to see AWADA on their own.  For example, one of M-1' patients, H.T., randomly appeared at AWADA's office one day. AWADA texted M-1 and asked him/her if H.T. was with M-1 that day.  When M-1 replied that H.T. was not with him/her that day, AWADA informed M-1 that he only wrote H.T. a prescription for Vicodin.

75.     After stepping away from AWADA, M-1 received calls from AWADA to see if s/he wanted to come in and be seen by AWADA as a patient so that s/he could get his/her Vicodin.  Whenever M-1 came in, AWADA always told M-1 that "he was hurting" for patients, and that "I need more patients."  AWADA told M-1 that he can only bill patients

26

once a year for stress tests and that he needed new patients in order to bill for more stress tests.

76.     AWADA reached out to M-1 approximately a month before M-1 was arrested in August 2012. AWADA told M-1 that he had a new doctor working for him, COLLAZO. COLLAZO was working for AWADA out of MIDWEST-1. AWADA asked M-1 to bring two or three patients a day to COLLAZO at MIDWEST-1.   AWADA controlled COLLAZO, and through COLLAZO, was still writing prescriptions in exchange for cash. AWADA told M-1 that he had it all under control and that M-1 did not need to talk with COLLAZO about writing prescriptions for his/her patients. M-1 took seven or eight of his/her patients to see COLLAZO who wrote each patient a prescription for Roxicodone. M-1 said that s/he did not get a chance to really get rolling with COLLAZO before s/he was arrested later that month.

77.     After taking his/her seven or eight patients to COLLAZO, M-1 went to see AWADA. This visit, according to M-1, was only about paying AWADA for the prescriptions COLLAZO wrote for M-1's patients. The visit was not about M-1 having an abscess. AWADA asked M-1 for cash in return for COLLAZO writing M-1 the controlled substance prescriptions. Prior to this meeting, AWADA had texted M-1 with the message "WTF, bro." M-1 told AWADA that s/he could not pay him at that time because M-1 could not find any pharmacies that would fill Roxicodone prescriptions. M-1 told AWADA that s/he heard on the street that the Oxymorphone pills would not "gel" and s/he would be able to sell those pills on the street. AWADA told M-1 that if he could move the Oxymorphone, then AWADA would start writing prescriptions for Oxymorphone. At this meeting, AWADA wrote M-1 a prescription for Oxymorphone. M-1 did not have a chance to get that prescription filled before getting arrested. M-1 said this was the last time s/he saw AWADA.

78.     AWADA told M-1 that he has "people on the inside" of law enforcement and that he received a call from one of his law enforcement sources who informed AWADA that his office was being watched by the DEA. This source also told AWADA that he was

"hot." AWADA never told M-1 the name of the source who called him. M-1 was unsure but thought AWADA received this call sometime around the end of 2011. After receiving this tip, AWADA told M-1 that "I'm only going to deal with you from now on." Prior to this call, AWADA was working with other patient recruiters/marketers as well. Analysis of AWADA's prescriptions is discussed in the next section but there was a significant drop off in both total prescriptions written by AWADA and prescriptions written for Schedule IIs by AWADA from January 2012 to April 2012 and March 2012 to April 2012 respectively.

### VIII.  MAPS DATA ANALYSIS

79.    Several MAPS reports for patients previously identified on empty prescriptions bottles recovered from multiple trash collections at M-1's Residence-1 were run. MAPS reports are used to identify all controlled substance prescriptions dispensed by pharmacies and practitioners in the State of Michigan. The MAPS chart below lists patients identified from the trash collections who received prescriptions from AWADA from June 2012 thru July 2012.

80.    As the following chart illustrates, some of AWADA's patients, who were once receiving prescriptions for Schedule II drugs such as Oxycodone from AWADA, are now receiving prescriptions for Schedule III drugs such as Vicodin from AWADA. This information corroborates what Investigators were told by M-1 and other witnesses about AWADA changing his prescribing habits after learning that the DEA was looking into his medical practice. Additionally, M-1 continued to obtain schedule II, III, and IV pharmaceutical drugs from AWADA even after AWADA had said he stopped prescribing controlled substances and was out of the pain management business in March 2012. In fact, M-1 filled prescriptions from AWADA on June 23, 2012, for 120 Hydrocodone Bitartrate which is a Schedule III narcotic and 120 Schedule IV Xanax. M-1 then filled two more prescriptions for another 120 Hydrocodone Bitartrate and 90 Schedule II Oxycodone on June 29, 2012, only six days later.

28

| PTs | Doctor | Filled Date | DEA Sch. | Drug Product Name | Form | Strength | QTY |
|-----|--------|-------------|----------|-------------------|------|----------|-----|
| C.Y. | AWADA | 6/4/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 750 MG-7.5 MG | 120 |
| O.G. | AWADA | 6/6/2012 | 5 | CODEINE/PROMETHAZINE | SYR | 10 MG/5 ML-6.25 MG/5 ML | 300 |
| M.S. | AWADA | 6/14/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 325 MG-10 MG | 120 |
| M.S. | AWADA | 6/14/2012 | 5 | CODEINE/PROMETHAZINE | SYR | 10 MG/5 ML-6.25 MG/5 ML | 240 |
| M.T. | AWADA | 6/14/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 500 MG-10 MG | 90 |
| M.T. | AWADA | 6/14/2012 | 4 | ALPRAZOLAM | TAB | 2 MG | 90 |
| Y.F. | AWADA | 6/16/2012 | 4 | ALPRAZOLAM | TAB | 2 MG | 30 |
| Y.F. | AWADA | 6/18/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 750 MG-7.5 MG | 120 |
| O.G. | AWADA | 6/19/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 750 MG-7.5 MG | 120 |
| O.G. | AWADA | 6/21/2012 | 4 | ALPRAZOLAM | TAB | 2 MG | 60 |
| D.K. | AWADA | 6/22/2012 | 4 | ALPRAZOLAM | TAB | 2 MG | 60 |
| U.S. | AWADA | 6/22/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 750 MG-7.5 MG | 120 |
| U.S. | AWADA | 6/22/2012 | 4 | ALPRAZOLAM | TAB | 2 MG | 60 |
| M-1 | AWADA | 6/23/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 500 MG-10 MG | 120 |
| M-1 | AWADA | 6/23/2012 | 4 | ALPRAZOLAM | TAB | 2 MG | 120 |
| D.K. | AWADA | 6/24/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 500 MG-10 MG | 120 |
| V.P. | AWADA | 6/27/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 500 MG-10 MG | 120 |
| V.P. | AWADA | 6/27/2012 | 4 | ALPRAZOLAM | TAB | 1 MG | 60 |
| E.H. | AWADA | 6/29/2012 | 4 | ALPRAZOLAM | TAB | 2 MG | 90 |
| E.H. | AWADA | 6/29/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 750 MG-7.5 MG | 120 |
| M-1 | AWADA | 6/29/2012 | 2 | OXYCODONE HYDROCHLORIDE TABLETS | TAB | 30mg | 90 |
| M-1 | AWADA | 6/29/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 750 MG-7.5 MG | 120 |
| Y.F. | AWADA | 7/12/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 750 MG-7.5 MG | 120 |
| M.S. | AWADA | 7/13/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 325 MG-10 MG | 120 |
| M.T. | AWADA | 7/16/2012 | 3 | HYDROCODONE BITARTRATE AND ACETAMIN | TAB | 750 MG-7.5 MG | 120 |
| C.Y. | AWADA | 7/17/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 750 MG-7.5 MG | 120 |
| D.K. | AWADA | 7/20/2012 | 3 | APAP/HYDROCODONE BITARTRATE | TAB | 500 MG-10 MG | 120 |
| D.K. | AWADA | 7/20/2012 | 4 | ALPRAZOLAM | TAB | 2 MG | 60 |
| U.S. | AWADA | 7/21/2012 | 3 | HYDROCODONE BITARTRATE AND ACETAMIN | TAB | 750 MG-7.5 MG | 120 |
| U.S. | AWADA | 7/21/2012 | 4 | ALPRAZOLAM | TAB | 2 MG | 60 |
| M.T. | AWADA | 7/23/2012 | 4 | ALPRAZOLAM | TAB | 2 MG | 60 |

81.     With respect to AWADA learning about a DEA investigation into his prescribing habits, a MAPS report was run to determine AWADA's overall prescription counts on a

monthly basis from January 2010 into August 2012 and broken down by DEA schedules. The resulting chart is listed below.

| DEA SCHEDULE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Filled Dates** | **0** | **2** | **3** | **4** | **5** | **R** | **Unavailable** | **Total** |
| **January 2010** | | 2,424 | 23,334 | 12,388 | 4,373 | | | 42,519 |
| **February 2010** | | 3,760 | 28,368 | 15,001 | 7,335 | | 60 | 54,524 |
| **March 2010** | | 8,209 | 43,046 | 19,436 | 6,839 | | 120 | 77,650 |
| **April 2010** | 62 | 10,022 | 48,407 | 21,943 | 7,674 | | 60 | 88,168 |
| **May 2010** | | 11,718 | 48,599 | 21,898 | 7,633 | 280 | 60 | 90,188 |
| **June 2010** | 30 | 14,985 | 54,350 | 23,394 | 6,864 | | 60 | 99,683 |
| **July 2010** | 60 | 16,510 | 51,269 | 25,939 | 3,914 | 120 | 10 | 97,822 |
| **August 2010** | | 19,021 | 52,951 | 24,066 | 4,060 | 120 | | 100,218 |
| **September 2010** | | 12,820 | 53,390 | 22,502 | 8,974 | | | 97,686 |
| **October 2010** | 240 | 14,490 | 63,810 | 25,099 | 12,364 | 240 | 120 | 116,363 |
| **November 2010** | 180 | 19,332 | 63,882 | 25,016 | 15,874 | | 660 | 124,944 |
| **December 2010** | | 19,846 | 51,910 | 20,298 | 17,394 | 90 | 540 | 110,078 |
| **January 2011** | 180 | 20,269 | 58,125 | 23,615 | 18,632 | | 180 | 121,001 |
| **February 2011** | 360 | 25,093 | 64,891 | 26,316 | 23,211 | 120 | 84 | 140,075 |
| **March 2011** | 435 | 33,072 | 71,819 | 26,683 | 23,202 | 300 | 180 | 155,691 |
| **April 2011** | 600 | 29,372 | 70,543 | 29,601 | 20,304 | 290 | 210 | 150,920 |
| **May 2011** | 580 | 33,017 | 67,448 | 27,515 | 16,774 | | 60 | 145,394 |
| **June 2011** | 570 | 40,774 | 81,300 | 30,537 | 17,474 | 450 | 132 | 171,237 |
| **July 2011** | 490 | 41,967 | 77,410 | 29,230 | 20,574 | 90 | 593 | 170,354 |
| **August 2011** | 534 | 47,260 | 93,431 | 31,038 | 15,184 | 360 | | 187,807 |
| **September 2011** | 240 | 52,813 | 88,660 | 31,492 | 12,451 | 300 | 473 | 186,429 |
| **October 2011** | 330 | 60,967 | 104,123 | 36,461 | 21,751 | 118 | 132 | 223,882 |
| **November 2011** | 90 | 58,446 | 108,953 | 37,252 | 29,412 | 476 | 533 | 235,162 |
| **December 2011** | 360 | 59,830 | 116,328 | 39,252 | 34,767 | 540 | 360 | 251,437 |
| **January 2012** | | 65,960 | 115,357 | 40,493 | 34,786 | 6,150 | | 262,746 |
| **February 2012** | 90 | 49,446 | 97,171 | 35,499 | 33,130 | 2,520 | 534 | 218,390 |
| **March 2012** | 480 | 32,010 | 102,641 | 33,900 | 19,903 | 540 | 144 | 189,618 |
| **April 2012** | 180 | 13,934 | 81,775 | 26,287 | 15,651 | 750 | 120 | 138,697 |
| **May 2012** | 540 | 17,664 | 84,926 | 24,743 | 16,237 | 420 | 300 | 144,830 |
| **June 2012** | 1,040 | 17,112 | 77,135 | 27,472 | 15,011 | 360 | 360 | 138,490 |
| **July 2012** | 1,700 | 12,794 | 71,012 | 23,994 | 7,556 | 270 | 840 | 118,166 |
| **August 2012** | 150 | 6,840 | 38,140 | 13,235 | 3,601 | 240 | 600 | 62,806 |
| **Grand Total** | 9,521 | 871,777 | 2,254,504 | 851,597 | 502,909 | 15,144 | 7,525 | 4,512,977 |

82.     Based upon a review of the MAPS data above, the chart illustrates that AWADA reduced his total prescriptions for controlled substances by approximately 46% from January 2012 to April 2012. Additionally, AWADA cut his Schedule II prescriptions by over 50% from March 2012 to April 2012. This data corroborates the information received from M-1, SOIs, CSs, and the UCs that AWADA had changed his prescribing habits based upon information he had received that the DEA was investigating his practice.

## IX.     INTERVIEW OF AWADA

83.     On August 28, 2012, Investigators interviewed AWADA at MIDWEST-2, subsequent to the arrest of M-1. AWADA was shown a picture of M-1 and asked if he knew who it was. AWADA responded by identifying M-1 by name and further stated that M-1 was a patient who had just been in the office the previous week. AWADA stated that M-1 had been a patient for a couple of years. AWADA said that one of his staff may have told AWADA that M-1 was involved in home health care or may have owned a nursing home. AWADA stated that M-1 was well-groomed and seemed decent.

84.     AWADA denied any other sort of business relationship with M-1 and said that M-1 came in once a month for his/her refills. When Investigators asked AWADA if he had ever talked to M-1 on the telephone to make appointments or for any other reason, AWADA said "No." When asked if M-1 brought in any groups of patients with him/her, AWADA said since he was in the back, he did not know if M-1 did or did not bring any patients into the office but AWADA did say that M-1 never brought anyone into the examination room with him/her.

85.     AWADA stated that his office was highly ethical and not a pain pill pushing dispensary and that he runs a very legitimate operation. AWADA said that M-1 usually gets pain meds, blood pressure meds and injections. AWADA said that based on his findings, M-1 was well within his/her rights for meds. When Investigators stated that in their last conversation AWADA said that he was no longer practicing "pain

31

management," AWADA said that he still had a handful of patients who still receive pain medications, because AWADA was afraid of those patients going through withdrawals.

## X.   TELEPHONE TOLLS

86.     Your Affiant reviewed telephone toll records for the time period August 6, 2012, through August 27, 2012, which showed that M-1's telephone had fifty-four contacts with the cellular telephone known to your Affiant as being utilized by AWADA. These contacts included both calls and text messages and ranged in duration from a few seconds to a couple of minutes. Review of the toll records also revealed that within the same time period, M-1's telephone had five contacts with two different telephone numbers associated with AWADA's medical office. The chart below shows the date, time and duration of the contact between M-1's Target Telephone and AWADA's cellular telephone and AWADA's medical office's telephones. The entries with 0:00:00 listed for the durations are text messages.

| Date | Time | Duration | Number Dialed | Dialed Name |
|------|------|----------|---------------|-------------|
| 8/6/2012 | 18:05:34 | 0:00:00 | IN- (586) 604-8680 | AWADA |
| 8/6/2012 | 18:06:53 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/6/2012 | 18:17:36 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/6/2012 | 18:46:41 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/6/2012 | 19:18:38 | 0:00:40 | (586) 604-8680 | AWADA |
| 8/9/2012 | 12:11:51 | 0:00:38 | IN- (586) 604-8680 | AWADA |
| 8/12/2012 | 19:14:34 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/12/2012 | 19:38:11 | 0:01:11 | IN- (586) 604-8680 | AWADA |
| 8/12/2012 | 20:13:13 | 0:00:06 | IN- (586) 604-8680 | AWADA |
| 8/13/2012 | 10:30:12 | 0:00:46 | (586) 604-8680 | AWADA |
| 8/13/2012 | 20:23:19 | 0:01:05 | IN- (586) 604-8680 | AWADA |
| 8/14/2012 | 8:50:42 | 0:00:39 | (586) 751-2020 | MIDWEST |
| 8/15/2012 | 6:39:52 | 0:00:00 | IN- (586) 604-8680 | AWADA |
| 8/15/2012 | 6:40:16 | 0:00:00 | IN- (586) 604-8680 | AWADA |
| 8/15/2012 | 7:38:42 | 0:00:25 | IN- (586) 604-8680 | AWADA |
| 8/15/2012 | 7:39:08 | 0:00:08 | IN- (586) 604-8680 | AWADA |
| 8/15/2012 | 7:43:26 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/15/2012 | 7:45:48 | 0:00:00 | IN- (586) 604-8680 | AWADA |
| 8/15/2012 | 7:48:03 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/15/2012 | 7:50:28 | 0:00:00 | (586) 604-8680 | AWADA |

| | | | | |
|---|---|---|---|---|
| 8/15/2012 | 8:24:59 | 0:02:00 | (586) 604-8680 | AWADA |
| 8/15/2012 | 19:07:33 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/15/2012 | 19:43:24 | 0:00:00 | IN- (586) 604-8680 | AWADA |
| 8/15/2012 | 20:30:08 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/15/2012 | 20:32:34 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/15/2012 | 20:33:44 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/15/2012 | 20:45:20 | 0:00:00 | IN- (586) 604-8680 | AWADA |
| 8/15/2012 | 20:47:01 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/15/2012 | 21:44:16 | 0:00:20 | (586) 604-8680 | AWADA |
| 8/16/2012 | 8:40:09 | 0:00:33 | (586) 751-4093 | MIDWEST |
| 8/16/2012 | 11:00:50 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/16/2012 | 11:17:38 | 0:00:00 | IN- (586) 604-8680 | AWADA |
| 8/16/2012 | 11:17:48 | 0:00:00 | IN- (586) 604-8680 | AWADA |
| 8/16/2012 | 11:17:56 | 0:00:00 | IN- (586) 604-8680 | AWADA |
| 8/16/2012 | 11:18:31 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/16/2012 | 11:20:38 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/17/2012 | 10:48:01 | 0:00:00 | IN- (586) 604-8680 | AWADA |
| 8/17/2012 | 11:47:04 | 0:00:25 | IN- (586) 604-8680 | AWADA |
| 8/17/2012 | 11:47:28 | 0:00:05 | IN- (586) 604-8680 | AWADA |
| 8/17/2012 | 11:48:19 | 0:00:41 | (586) 604-8680 | AWADA |
| 8/17/2012 | 15:19:51 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/17/2012 | 16:19:31 | 0:00:02 | (586) 604-8680 | AWADA |
| 8/17/2012 | 17:56:51 | 0:00:02 | (586) 604-8680 | AWADA |
| 8/17/2012 | 17:56:57 | 0:01:15 | (586) 604-8680 | AWADA |
| 8/17/2012 | 18:57:00 | 0:00:24 | (586) 604-8680 | AWADA |
| 8/17/2012 | 19:00:46 | 0:00:47 | (586) 604-8680 | AWADA |
| 8/17/2012 | 19:29:03 | 0:00:16 | IN- (586) 604-8680 | AWADA |
| 8/23/2012 | 9:26:40 | 0:00:34 | (586) 604-8680 | AWADA |
| 8/23/2012 | 9:27:24 | 0:00:34 | IN- (586) 604-8680 | AWADA |
| 8/23/2012 | 12:00:22 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/23/2012 | 12:14:57 | 0:00:00 | (586) 604-8680 | AWADA |
| 8/23/2012 | 15:45:13 | 0:01:02 | (586) 604-8680 | AWADA |
| 8/23/2012 | 17:21:38 | 0:00:55 | (586) 604-8680 | AWADA |
| 8/24/2012 | 17:05:58 | 0:00:25 | IN- (586) 751-2020 | MIDWEST |
| 8/24/2012 | 17:06:24 | 0:00:14 | IN- (586) 751-2020 | MIDWEST |
| 8/24/2012 | 17:20:51 | 0:00:02 | (586) 751-2020 | MIDWEST |
| 8/27/2012 | 8:11:35 | 0:00:00 | IN- (586) 604-8680 | AWADA |
| 8/27/2012 | 9:15:47 | 0:00:00 | (586) 604-8680 | AWADA |

| 8/27/2012 | 9:31:11 | 0:00:00 | IN- (586) 604-8680 | AWADA |

87.     After reviewing the previous chart, it shows that two text messages were sent from AWADA's cellular telephone on August 27, 2012, to M-1's telephone in the morning with a text message from M-1 to AWADA in between.  AWADA's statement to Investigators is directly contradicted by information received from multiple witnesses and the other forms of evidence that M-1 and AWADA did have a business relationship and that M-1 and AWADA conspired in the diversion of pharmaceutical controlled substances.

## XI.     M-1'S CELL PHONE SEARCH

88.     On August 31, 2012, your Affiant swore out a search warrant to extract data from M-1's cellular phone.  On September 6, 2012, the contents of M-1's cell phone were extracted pursuant to the execution of the warrant.  M-1's phone had only been in use by M-1 for a short period of time, from June 19, 2012 to August 27, 2012.  Your Affiant is aware that individuals involved in drug trafficking will routinely drop or switch phones in an effort to evade law enforcement monitoring or detection.  Relevant information and evidence of communication between AWADA and M-1 is listed below.

**A.     August 27, 2012 @ 1:11 p.m.**

89.     AWADA texted M-1 from phone number 586-604-8680.  The text stated, "Bro what happened. U gotta come c me."

**B.     August 27, 2012 @ 2:15 p.m.**

90.     M-1 texted AWADA from his/her cell phone. The text stated, "I will be to see u."

**C.     August 27, 2012 @ 2:31 p.m.**

91.     AWADA texted M-1 from phone number 586-604-8680. The text stated, "Ok bro."

34

## XII.   MEDICARE DATA ANALYSIS

### A.   Medicare Part B Data Analysis

92.    Analysis of Medicare Part B data reveals that from January 1, 2007, through October 10, 2012, AWADA and MIDWEST, utilizing NPI 1811984594, billed Medicare Part B approximately $11,070,351.24 for a total of 129,058 claims, all of which are attributed to services purportedly rendered by AWADA.  For these claims, Medicare Part B paid AWADA and MIDWEST approximately $4,461,889.16.  The top procedure codes paid by Medicare Part B include office visit codes, therapeutic injection codes, and blood work codes.  The following spreadsheet breaks down the claims submitted to Medicare by year for AWADA at MIDWEST and the corresponding billed and paid amounts.

| Medicare Part B Data – AWADA | | | |
|---|---|---|---|
| Year | # of Claims | Amount Billed | Amount Paid |
| 2007 | 8,530 | $579,302.00 | $269,480.18 |
| 2008 | 7,129 | $486,291.00 | $233,943.37 |
| 2009 | 9,016 | $742,118.00 | $346,612.65 |
| 2010 | 34,728 | $3,306,763.00 | $1,351,545.42 |
| 2011 | 44,248 | $4,004,085.24 | $1,555,840.55 |
| 2012* | 25,407 | $1,951,792.00 | $704,466.99 |
| Totals | 129,058 | $11,070,351.24 | $4,461,889.16 |
| *2012 Medicare Part B Data is through October 10, 2012. | | | |

93.    Of note, the number of claims AWADA submitted to Medicare Part B increased from 9,016 in 2009 to 34,728 in 2010, an increase of 261%.   Furthermore, over the same time period, the amount AWADA billed Medicare Part B increased 346% from $742,118 to $3,306,763 and the amount Medicare Part B paid AWADA increased from $346,612.65 to $1,351,545.42, an increase of 290%.  In 2011, the last full year of claims data available, the number of claims AWADA submitted to Medicare Part B increased to 44,248 an increase of 360% from 2009 and an increase of 27% from 2010.  The amount AWADA billed Medicare Part B increased to $4,004,085.24, an increase of 439% from 2009 and an increase of 21% from 2010.  The amount Medicare Part B paid AWADA also increased to $1,555,840.55, an increase of 349% from 2009 and an increase of 15% from 2010.

**B.    Medicare Part D Data Analysis**

94.    Analysis of Medicare Part D data reveals that from January 1, 2009, through June 27, 2012, Medicare paid $3,203,630.51 for a total of 49,212 drugs prescribed by AWADA.  Of these 49,212 prescriptions, 11,161 were for controlled substances as illustrated in the following summary chart.

| Medicare Part D Data – AWADA | | | |
|---|---|---|---|
| Year | # of Claims | # of Controlled Substance Claims | Amount Paid |
| 2009 | 7,759 | 781 | $468,122.60 |
| 2010 | 11,998 | 2,750 | $981,906.32 |
| 2011 | 19,521 | 5,430 | $1,186,351.78 |
| 2012* | 9,934 | 2,200 | $567,249.81 |
| Totals | 49,212 | 11,161 | $3,203,630.51 |
| *2012 Medicare Part D Data is through June 27, 2012. | | | |

95.    The number of prescription drugs written by AWADA and paid for by Medicare Part D increased from 7,759 in 2009 to 11,998 in 2010, an increase of 54%.  Over the same period of time, the number of controlled substance prescriptions written by AWADA and paid for by Medicare Part D increased from 781 to 2,750, an increase of 252%; while the amount paid by Medicare Part D for all prescriptions written by AWADA increased from $468,122.60 to $981,906.32, an increase of 110%.  In 2011, the last full year of Medicare Part D claims data available, the number of prescription drugs written by AWADA and paid for by Medicare Part D increased to 19,521 (an increase of 152% from 2009 and an increase of 63% from 2010); the number of controlled substance prescriptions written by AWADA and paid for by Medicare Part D increased to 5,430 (an increase of 595% from 2009 and an increase of 97% from 2010); and the amount paid by Medicare Part D for all prescriptions written by AWADA increased to $1,186,351.78 (an increase of 153% from 2009 and an increase of 21% from 2010).  This data analysis supports the statements made by M-1 that AWADA was requesting s/he bring in more and more Medicare beneficiaries and that AWADA was prescribing those Medicare beneficiaries controlled substances.

### C.   Billing For Dead Beneficiaries

96.     Your Affiant received information from CS-1 that AWADA bills health insurers (such as Medicare) for services provided to his patients after their death.   Additionally, your Affiant received information that AWADA back-dates bills in order to submit them to health insurers so that he got paid for services that were never actually provided to patients who had died.   Analysis of Medicare Part B data reveals that AWADA submitted twenty-six claims for thirteen Medicare beneficiaries for dates of service that occurred after their death.   AWADA billed Medicare Part B approximately $3,512 for services supposedly performed after the patient's date of death and Medicare Part B paid AWADA $213.09 for these twenty-six claims as illustrated in the table on below.

| Dead Patient Analysis – Services Billed After Date of Death – AWADA Medicare Part B Data | | | | | | |
|---|---|---|---|---|---|---|
| Patient Initials | Procedure Code | Date of Death | Date of Service | Days Between Date of Death and Date of Service | Amount Billed | Amount Paid |
| G.V. | G0181 | 6/10/2008 | 7/14/2008 | 34 | $178.00 | $0.00 |
| G.V. | G0181 | 6/10/2008 | 7/14/2008 | 34 | $178.00 | $0.00 |
| R.M. | G0180 | 6/16/2008 | 7/14/2008 | 28 | $107.00 | $0.00 |
| R.M. | G0180 | 6/16/2008 | 8/6/2008 | 51 | $107.00 | $0.00 |
| M.P. | G0181 | 8/16/2008 | 8/18/2008 | 2 | $178.00 | $89.29 |
| M.P. | G0179 | 8/16/2008 | 8/18/2008 | 2 | $82.00 | $37.98 |
| J.M. | G0180 | 10/16/2009 | 10/19/2009 | 3 | $107.00 | $0.00 |
| H.A. | G0180 | 1/9/2010 | 1/27/2010 | 18 | $107.00 | $0.00 |
| D.W. | G0180 | 2/8/2010 | 3/11/2010 | 31 | $107.00 | $0.00 |
| H.P. | G0180 | 3/3/2010 | 3/11/2010 | 8 | $107.00 | $0.00 |
| M.V. | 99239 | 3/20/2010 | 3/21/2010 | 1 | $139.00 | $0.00 |
| W.S. | G0180 | 3/30/2010 | 4/6/2010 | 7 | $107.00 | $0.00 |
| S.S. | G0181 | 10/8/2010 | 10/28/2010 | 20 | $178.00 | $0.00 |
| S.S. | 99233 | 10/8/2010 | 10/9/2010 | 1 | $150.00 | $85.82 |
| C.W. | 85025 | 3/27/2011 | 3/28/2011 | 1 | $25.00 | $0.00 |
| C.W. | J7321 | 3/27/2011 | 3/28/2011 | 1 | $350.00 | $0.00 |
| C.W. | 82962 | 3/27/2011 | 3/28/2011 | 1 | $15.00 | $0.00 |
| C.W. | 36415 | 3/27/2011 | 3/28/2011 | 1 | $10.00 | $0.00 |
| C.W. | 20610 | 3/27/2011 | 3/28/2011 | 1 | $200.00 | $0.00 |
| C.W. | 99204 | 3/27/2011 | 3/28/2011 | 1 | $195.00 | $0.00 |
| C.W. | 93000 | 3/27/2011 | 3/28/2011 | 1 | $50.00 | $0.00 |
| C.W. | 64421 | 3/27/2011 | 3/28/2011 | 1 | $375.00 | $0.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| C.W. | J1040 | 3/27/2011 | 3/28/2011 | 1 | $40.00 | $0.00 |
| C.W. | 96372 | 3/27/2011 | 3/28/2011 | 1 | $135.00 | $0.00 |
| M.A. | G0181 | 7/5/2011 | 7/25/2011 | 20 | $178.00 | $0.00 |
| I.M. | G0180 | 7/21/2011 | 8/9/2011 | 19 | $107.00 | $0.00 |
| *Data received from Trust Solutions, LLC | | | | Totals: | $3,512.00 | $213.09 |

97.     Furthermore, your Affiant received information from SOI-1 that if AWADA became aware that one of his patients had died, he would bill a deceased patient's health insurance (such as Medicare) for services purportedly performed just before their death. Analysis of Medicare Part B data reveals that AWADA submitted thirty-six claims for twenty-seven Medicare beneficiaries for dates of service that occurred on their date of death.   AWADA billed Medicare Part B approximately $6,419 for services purportedly performed on the patient's date of death and Medicare Part B paid AWADA $2,543.06 for these thirty-six claims.  This information is shown in the following spreadsheet.

| Dead Patient Analysis – Services Billed on Day of Death – AWADA Medicare Part B Data | | | | | |
|---|---|---|---|---|---|
| Patient Initials | Procedure Code | Date of Death | Date of Service | Amount Billed | Amount Paid |
| A.S. | 99238 | 7/4/2007 | 7/4/2007 | $102.00 | $57.22 |
| A.A. | 99238 | 7/16/2007 | 7/16/2007 | $102.00 | $57.22 |
| S.C. | 99232 | 1/4/2008 | 1/4/2008 | $80.00 | $54.09 |
| M.S | 99238 | 12/13/2008 | 12/13/2008 | $102.00 | $55.78 |
| T.T. | 99217 | 2/27/2009 | 2/27/2009 | $101.00 | $56.86 |
| L.O. | 99233 | 3/16/2009 | 3/16/2009 | $114.00 | $80.79 |
| B.W. | 99239 | 4/24/2009 | 4/24/2009 | $139.00 | $81.65 |
| H.A. | 99291 | 1/9/2010 | 1/9/2010 | $368.00 | $0.00 |
| H.A. | 99291 | 1/9/2010 | 1/9/2010 | $368.00 | $185.54 |
| J.F. | 99291 | 1/21/2010 | 1/21/2010 | $368.00 | $185.54 |
| D.W. | 99233 | 2/8/2010 | 2/8/2010 | $114.00 | $0.00 |
| D.W. | 99233 | 2/8/2010 | 2/8/2010 | $114.00 | $83.97 |
| P.U. | 99239 | 2/16/2010 | 2/16/2010 | $139.00 | $84.03 |
| E.S. | 99239 | 3/15/2010 | 3/15/2010 | $139.00 | $84.03 |
| E.S. | 99239 | 3/15/2010 | 3/15/2010 | $139.00 | $0.00 |
| M.V. | 99291 | 3/20/2010 | 3/20/2010 | $368.00 | $0.00 |
| W.S. | 99238 | 3/30/2010 | 3/30/2010 | $102.00 | $0.00 |
| W.S. | 99238 | 3/30/2010 | 3/30/2010 | $102.00 | $57.23 |

| | | | | | |
|---|---|---|---|---|---|
| R.G. | 99239 | 4/4/2010 | 4/4/2010 | $139.00 | $84.03 |
| K.M. | 99238 | 6/19/2010 | 6/19/2010 | $102.00 | $0.00 |
| K.M. | 99238 | 6/19/2010 | 6/19/2010 | $102.00 | $58.50 |
| D.B. | 99238 | 8/26/2010 | 8/26/2010 | $102.00 | $58.50 |
| S.S. | G0181 | 10/8/2010 | 10/8/2010 | $178.00 | $87.79 |
| S.S. | 99223 | 10/8/2010 | 10/8/2010 | $275.00 | $166.58 |
| S.S. | G0181 | 10/8/2010 | 10/8/2010 | $178.00 | $0.00 |
| J.W. | 99239 | 11/12/2010 | 11/12/2010 | $150.00 | $85.88 |
| B.R. | 99238 | 12/6/2010 | 12/6/2010 | $102.00 | $0.00 |
| B.R. | 99238 | 12/6/2010 | 12/6/2010 | $102.00 | $58.50 |
| V.L. | 99238 | 1/4/2011 | 1/4/2011 | $102.00 | $58.30 |
| I.W. | 99238 | 4/14/2011 | 4/14/2011 | $102.00 | $58.30 |
| C.M. | 99291 | 5/11/2011 | 5/11/2011 | $368.00 | $0.00 |
| C.M. | 99291 | 5/11/2011 | 5/11/2011 | $368.00 | $186.23 |
| T.W. | 99291 | 6/10/2011 | 6/10/2011 | $368.00 | $186.23 |
| M.A | 99239 | 7/5/2011 | 7/5/2011 | $150.00 | $85.74 |
| R.Y. | 99291 | 8/24/2011 | 8/24/2011 | $368.00 | $186.23 |
| V.K. | 99238 | 8/25/2011 | 8/25/2011 | $102.00 | $58.30 |
| *Data received from Trust Solutions, LLC | | | Totals: | $6,419.00 | $2,543.06 |

98.     As discussed above, your Affiant has received information from several sources that AWADA worked closely with M-1, who brought drug seeking patients to AWADA at MIDWEST, and that most of these drug seeking patients were Medicare beneficiaries.

99.     Through trash pulls and information gathered through search warrants, your Affiant has identified fifty-five drug seeking patients brought to AWADA by M-1 who were Medicare beneficiaries.  Analysis of Medicare Part B data reveals that AWADA billed Medicare Part B $590,763.82 for 5,858 claims for these drug seeking patients.  For these claims, Medicare Part B paid AWADA $209,764.63.  The top procedure codes billed by AWADA for these patients include office visits, X-rays, therapeutic shots, and blood work.

100.    Analysis of Medicare Part D data of the fifty-five drug seeking patients who were Medicare beneficiaries reveals that Medicare Part D paid $162,037.10 for 2,623 prescriptions written by AWADA.  Further analysis reveals that for these fifty-five drug

seeking patients, Medicare Part D paid $73,365.97 for 1,102 controlled substance prescriptions written by AWADA.

101.    Based on the information contained in this complaint, probable cause exists that Hussein "Sam" AWADA, M.D., Conspired to Unlawfully Distribute a Controlled Substance, namely Oxycodone Hydrochloride and/or Oxymorphone, in violation of Title 21, United States Code, Section 846, and Conspired to Commit Health Care Fraud, in violation of Title 18, United States Code, Section 1349.

Edward Moore, Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me on this 11th day of December 2012.

Honorable
United States Magistrate Judge
Eastern District of Michigan

40